**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

§
COLONY INSURANCE COMPANY, §
§
　　　**Plaintiff,** §
VS. § **CIVIL ACTION NO. 4:16-CV-408**
§
ADSIL, INC., *et al*, §
§
　　　**Defendants.** §
§

## MEMORANDUM & ORDER

　　　This lawsuit is aimed at determining who should pay the costs and expenses arising from litigation in state court. In the underlying case, Calallen Independent School District ("Calallen"), located near Corpus Christi, Texas, sought recovery against numerous entities for the corrosion of its HVAC equipment.[1] Adsil, Inc. and CJO Enterprises, Inc. were defendants in that matter and are in the present one as well. Adsil manufactures a product meant to prevent corrosion of such equipment. Adsil, based in Florida and doing business nationally, contracted with CJO to handle the installation of Adsil's anti-corrosion product in Texas. CJO applied it to Calallen's equipment and thereby embroiled both companies in the Calallen litigation.

　　　In a motion for summary judgment, Plaintiff Colony Insurance Company, Adsil's insurer, contends that CJO's contract with Adsil imposes a duty to indemnify Adsil for costs arising from CJO's own negligent acts. (Doc. No. 54.) Because it represented Adsil in the Calallen litigation, Colony argues that it is owed that indemnification. In its own motion for summary judgment,

---

[1] *Calallen Independent School District v. Teal Construction, et al.*, Case No. 2014DCV-6027-B, (117th Judicial District Court, Nueces County, Texas).

1

CJO contends that the indemnification clause is invalid, so it owes Colony nothing. (Doc. No. 53.) The parties also disagree on whether Florida or Texas should supply the governing law.

Based on careful consideration of the parties' extensive briefing, the applicable law, and oral argument, the Court holds that Florida law applies. That law, in turn, entails an inquiry into the actual facts giving rise to the Calallen litigation. That inquiry reveals genuine issues of material fact, warranting denial of both parties' motions for summary judgment.

## I.     BACKGROUND

### a.  Adsil and CJO

Adsil is a Nevada corporation with its principal place of business in Florida. (Doc. No. 37 at 2.) CJO is a Texas corporation. In 2005, Adsil and CJO executed an "Independent Mobile Installer Agreement." (Doc. No. 54-1 at 180.) The Agreement made CJO a "nonexclusive Mobile Installer" for the installation of certain Adsil products in Texas. (*Id.* at 180–81.) The Agreement contained the following indemnity clause:

> 13. **<u>Indemnification</u>** Mobile Installer [CJO] shall indemnify and hold Company [Adsil] and its officers, directors, employees, agents and representatives, harmless from and against any and all claims, losses, obligations, liabilities, costs and expenses (including without limitation legal and other fees) arising from any negligent acts or omissions of Mobile Installer or its employees, agents or representatives, and, in addition, such indemnification by Mobile Installer shall cover any claims, losses, obligations, liabilities, costs or expenses arising out of any breach of this Agreement by Mobile Installer.

(*Id.* at 182–83.) The Agreement also provided that it would be governed by Florida law and that Flagler County, Florida would be the exclusive venue for any dispute between Adsil and CJO. (*Id.* at 191.)

### b. Calallen's Claims

Calallen's Original Petition was filed in late November 2014. The petition identified eight defendants, three of which—Weathertrol, Air Pro, and AAON—would eventually file cross-claims against Adsil. (Doc. No. 54-1 at 6.) CJO and Adsil were not yet in the suit. Calallen asserted that "multiple air cooled condensing units and roof top air conditioning units" had failed, and it advanced seven general theories of liability (e.g., "Failure to comply with applicable codes and standards"), which were not particularly associated with any of the defendants. (*Id.* at 8.)

Calallen's First Amended Petition, filed in early December 2014, added CJO as a defendant. (Doc. No. 54-1 at 13.) Calallen's allegations and theories of liability were no more specific. Calallen's Second Amended Petition, filed in mid-January 2015, added Adsil as a defendant. (Doc. No. 54-1 at 18.) This petition retained the broad, imprecise allegations and theories of the previous petitions. The same was true of Calallen's Third, Fourth, and Fifth Amended Petitions, filed over the course of 2015.

In May 2015, likely between the filing of Calallen's Third and Fourth Amended Petitions, counsel for Adsil wrote to CJO and to CJO's insurer, asking CJO to take up Adsil's defense in the Calallen litigation. (Doc. No. 54-1 at 196, 200.) CJO refused. (Doc. No. 54 at 3.)

Filed in October 2015, Calallen's Sixth Amended Petition advanced specific allegations and theories of liability as to each defendant. (Doc. No. 54-1 at 34–41.) Its allegations centered on the "severe corrosion of condenser coils, copper tubing and aluminum fins" in the "air-cooled condensing units and roof top air conditioning units" at five Calallen campuses. (*Id.* at 35.) Calallen brought products liability claims against the manufacturers of the units, AAON and

another company; negligence claims against Calallen's contractors, Weathersol, Air Pro, and others; and negligence claims against Adsil and CJO. (*Id.* at 37–40.)

Calallen alleged that Adsil's anti-corrosion product, "commonly known as Microguard AD35 HVAC Clear Protective Treatment or Microguard AD35 HVAC/R Coil Fin-Pack Protective Coating," was used on some unspecified number of the HVAC units. (Doc. No. 54-1 at 38–39.) "At issue," according to Calallen, was "the proper cleaning and preparation of existing condenser coils prior to recoating of existing coils [with Adsil's product]." (*Id.* at 39.) "Adsil sub-contracted with Defendant CJO to perform the cleaning, prep, and recoating functions at several Calallen sites. Instead of fixing the problem, CJO caused more harm by damaging additional units, and for which damage [Calallen] sues." (*Id.*) Accordingly, Calallen contended that "Adsil and CJO were negligent, jointly and severally, in failing to warn others about the proper use of Adsil's product(s)." (*Id.*)

The allegations about Adsil were decidedly ambiguous. It was not clear how exactly Adsil had been negligent, in Calallen's view: vicariously, through its subcontractor, or directly, through some sort of failure to warn. Calallen's Seventh Amended Petition, filed in November 2015, was no more specific. (Doc. No. 54-1 at 43.)

Its Eighth, filed in late December 2015, was more specific. It alleged that Adsil had "failed to provide proper and adequate instructions, protocols, and procedures to jobbers, distributors, and end users of [its] product … with regard to proper and effective cleaning, prepping, and recoating procedures necessary to apply the coating as originally intended by the manufacturer." (Doc. No. 54-1 at 57.) Separately, it accused CJO of "negligent failure to properly install or apply the product." (*Id.* at 58.) Adsil's and CJO's negligence, in turn, "jointly and severally," were the proximate cause of Calallen's damages. (*Id.*)

The same allegations appeared in Calallen's Ninth and Tenth Amended Petitions, but not in the Eleventh. (Doc. No. 54-1 at 62–91.) Those three petitions were filed in a flurry in late June 2016. According to Colony, all claims against Adsil were nonsuited. (Doc. No. 54 at 3.) Evidently "[Calallen] dropped its claims against Adsil." (Doc. No. 37 at 4.) The Eleventh and subsequent amended petitions addressed only CJO's negligence in the application of Adsil's product.

### c. Cross-Claims

Adsil also faced cross-claims from its co-defendants in the Calallen litigation. Defendant Weathertrol, a contractor for Calallen, filed a cross-claim against Adsil, CJO, and two other co-defendants in early May 2016. (Doc. No. 54-1 at 131). Its original cross-claim attributed no particular conduct to Adsil other than manufacturing the product at issue. Its First Amended Cross-Claim, filed in early June 2016, alleged that Adsil was responsible for any "issues with the instructions for applying the coating, the instructions for maintaining the coating or the application thereof at [Calallen High School]." (*Id.* at 137.)

Defendant Air Pro, another contractor for Calallen, also filed a cross-claim against Adsil, CJO, and others. (Doc. No. 54-1 at 143.) In its original form, filed in late May 2016, Air Pro's petition said that Adsil was the manufacturer of the product applied to Calallen's HVAC units and thus, "to the extent there are issues with the coating material itself or the application thereof, both CJO and Adsil would be responsible for any alleged damages." (*Id.* at 144.) The amended cross-claim, filed sometime in June 2016, repeated those allegations and added that Adsil should be liable under Section 82.002 of the Texas Civil Practice & Remedies Code. (*Id.* at 148.) That statute obligates manufacturers of defective products to indemnify sellers for any loss arising from a products liability action, unless the seller's own negligence was the cause.

Defendant AAON, a manufacturer of HVAC units, filed claims of its own. In an Amended Petition filed in late January 2017, it said that it incurred substantial legal expenses defending itself against Calallen and that Adsil and CJO owed it indemnification. (Doc. No. 54-1 at 161.) AAON had sold roof-top HVAC units to Calallen, which then had Adsil's product applied to them by CJO. AAON wanted CJO and Adsil to indemnify it for all costs arising from the damage to Calallen's units, including AAON's cost of defending itself against Calallen. (*Id.* at 159–61.) AAON staked its claim for indemnity on Section 82.002 of the Texas Civil Practice and Remedies Code, the statute indemnifying innocent sellers of defective products. (*Id.* at 161.)

Adsil, through Colony, soon settled with AAON. (Doc. No. 54-1 at 569.) In a settlement agreement executed in mid-July 2017, AAON acknowledged it had received $130,000 from Adsil in return for releasing all claims. (*Id.* at 570.) Colony indicates that it paid $95,000 of that sum. (Doc. No. 54 at 14.) The fate of Weathersol's and Air Pro's claims against Adsil is not made clear in the parties' filings.

### d. The Present Case

Colony sued Adsil, CJO, and Calallen in February 2016, between Calallen's Eighth and Ninth Amended Petitions. An amended complaint followed in June 2016, which drew motions to dismiss. Colony had argued that CJO had both a duty to defend and a duty to indemnify Adsil concerning the underlying litigation with Calallen. This Court ruled that the Agreement between CJO and Adsil created only a duty to indemnify, dismissing Colony's claim against CJO as to the duty to defend. (Doc. No. 33 at 6–8.) This Court also ruled that the claim as to the duty to indemnify was not yet ripe, because the underlying litigation had not yet reached a judgment. (*Id.*)

Colony's Second Amended Complaint, the operative complaint, followed in April 2017. As to CJO, it sought "damages … in the amount of the defense costs Colony incurred and will incur in defending and indemnifying Adsil against the claims brought in the underlying lawsuit." (Doc. No. 37 at 7.) It also sought "the costs incurring prosecuting this action, including reasonable attorney's fees," and such other relief "to which Colony may show it is justly entitled." (*Id.* at 8.) In its motion for summary judgment, Colony adds that it is also entitled to indemnification from CJO for the settlement that it negotiated with AAON in July 2017. (Doc. No. 54 at 3.)

## II.     APPLICABLE LAW

### a.  Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment should be granted against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In gauging the existence of genuine disputes, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. *Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 854 (5th Cir. 2010).

### b.     Choice of Law

The parties' contract provides that Florida law should govern. CJO contends that it can overcome that contractual provision and justify the application of Texas law to the construction of its indemnity agreement with Adsil.

#### i.     Waiver

The Court must first determine whether Colony has waived the choice-of-law question. CJO argues that Colony has waived the choice-of-law question by filing this lawsuit in Texas and by not raising the question in prior pleadings. (Doc. No. 53 at 8.) CJO also notes that its contract with Adsil contained a venue provision, identifying Florida as the "exclusive venue," which Colony ignored. (*Id.* at 9.) Finally, CJO argues that Colony "relied solely on Texas law in responding to CJO's previous motion to dismiss." (*Id.*)

Colony contests each of these points. It notes that it announced its view that Florida law governs in the Second Joint Discovery Case Management Plan that the parties submitted in 2017. (Doc. No. 57 at 19.) It adds that it disregarded the contract's venue provision because it wanted to include Calallen in this lawsuit and Florida courts would not have had personal jurisdiction. (*Id.* at 22.) It also argues that the use of Texas law at the motion to dismiss stage was insignificant, because the legal questions at issue then were about justiciability and ripeness. (*Id.* at 23.)

Colony has the law on its side. "Under federal pleading requirements, [a party] need not plead the applicability of [a particular state's] law to preserve a choice-of-law question." *Kucel v. Walter E. Heller & Co.*, 813 F.2d 67, 74 (5th Cir. 1987). The party just has "the obligation to call the applicability of another state's law to the court's attention in time to be properly considered." *Id.* Colony has met that obligation.

In a diversity case, the forum state provides the choice-of-law rules. *Cardoni v. Prosperity Bank*, 805 F.3d 573, 580 (5th Cir. 2015). "Texas law recognizes the 'party autonomy rule' that parties can agree to be governed by the law of another state." *Exxon Mobil Corp. v. Drennen*, 452 S.W.3d 319, 324 (Tex. 2014). Contractual agreements are "not so unassailable," however. *Cardoni*, 805 F.3d at 580. "[A]lthough Texas courts permit choice-of-law agreements and the default position is that they are enforceable, it is not uncommon for a party to overcome them." *Id.* at 581.

To determine whether a party has overcome the contractual choice-of-law provision, Texas courts apply Section 187(2) of the Restatement (Second) of Conflicts of Laws. *Exxon Mobil*, 452 S.W.3d at 324. That section provides as follows:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied … unless either
>
> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
>
> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of applicable law in the absence of an effective choice of law by the parties.

(quoted in *Exxon Mobil*, 452 S.W.3d at 324–25). The parties agree that subsection (b) supplies the appropriate inquiry, not subsection (a). With Adsil's principal place of business being in Florida, there is concededly a "reasonable basis" for choosing that state's law in the contract.

The inquiry provided by subsection (b) has three parts. First, a court must determine whether the state chosen in the contract or an alternative state "has a more significant relationship with the parties and the transaction at issue." *Cardoni*, 805 F.3d at 582. This is the standard in Section 188 of the Restatement, which governs when a contract does not contain a

choice-of-law provision. The state with the more significant relationship is identified with reference to "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties." *Id.* (quoting Restatement § 188(2)).

Second, a court must determine whether the alternative state has a "materially greater interest" in the particular issue than the state chosen in the contract. This determination resembles the first. Courts look to where the parties reside, where the conduct and events at issue unfolded, where the segment of the public affected by the transaction resides, and similar facts. *See Cardoni*, 805 F.3d at 584–85; *Exxon Mobil*, 452 S.W.3d at 326–27.

Third, and presenting the most difficulty, a court must determine whether application of the chosen state's law would be "contrary to a fundamental policy" of the alternative state. *Exxon Mobil*, 452 S.W.3d at 327. The Supreme Court of Texas has not defined the concept of a "fundamental policy." *Id.* It has said that application of another state's law is not contrary to Texas's fundamental policy "merely because it leads to a different result than would obtain under [Texas's] law." *DeSantis v. Wackenhut*, 793 S.W.2d 670, 680 (Tex. 1990). That should be unsurprising, "as choice of law is going to be outcome determinative any time the parties are debating it." *Cardoni*, 805 F.3d at 587. But the Texas Supreme Court has gone farther, saying that even "the fact that the law of another state is materially different from the law of this state does not itself establish that application of the other state's law would offend the fundamental policy of Texas." *DeSantis*, 793 S.W.2d at 680.

Even so, "'fundamental policy' is often an elusive concept," because the Texas Supreme Court and the Restatement do not define it. *Cardoni*, 805 F.3d at 585. That court has said that

"the focus is on whether the law in question is a part of state policy so fundamental that the courts of the state will refuse to enforce an agreement contrary to that law, despite the parties' original intentions, and even though the agreement would be enforceable in another state connected with the transaction." *DeSantis*, 793 S.W.2d at 680. It is not altogether clear how a court is to square that guidance with the recognition that choice of law arises only when the difference would determine a case's outcome.

     *iii.*    *Analysis*

CJO has established the first two elements of the choice-of-law analysis. Texas has a more significant relationship to the case because it has more of the relevant contacts. Both Texas and Florida may be considered the "place of contracting" and the "place of negotiation" for the contract between Adsil and CJO, and one of the parties resides in each state. The performance of the contract, however, was substantially in Texas. The subject matter of the contract also was in Texas, the sole territory in which CJO was authorized to install Adsil products.

For similar reasons, Texas has a "materially greater interest" in the issue here. CJO, the party potentially liable for indemnification payments, is a Texas company. The alleged negligence of CJO occurred in Texas, while working on equipment belonging to a Texas school district that serves Texas schoolchildren. In *DeSantis*, a national employer based in Florida had subjected a Texas employee to a non-competition agreement. 793 S.W.2d at 679. He had done his work in Texas; formed an allegedly unlawful competitor in Texas; and in both instances had dealt with Texas consumers. *Id.* Texas was held to have the materially greater interest in whether the non-competition agreement at issue was enforceable. Similarly, in *Exxon Mobil*, an international employer headquartered in Texas had structured employee incentive programs to be governed by New York law. 452 S.W.3d at 322. A former employee, suing to obtain benefits

under those programs, had spent the bulk of his career with the company in Texas and still resided here. His benefits under the incentive programs were in jeopardy because he had gone to a competitor in Texas, allegedly a violation of the programs' terms. *Id.* Texas was again held to have a materially greater interest in the case than New York. *Id.* at 326–27.

The difficulty stems from the third part of the inquiry—whether the application of Florida law to the indemnity clause in Adsil and CJO's contract would contravene a fundamental policy of Texas. CJO argues that the indemnity clause in its contract with Adsil is unenforceable because it violates Texas's "express negligence" rule. (Doc. No. 53 at 9–10.) "The express negligence doctrine provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms. Under the doctrine of express negligence, the intent of the parties must be specifically stated within the four corners of the contract." *Ethyl Corp. v. Daniel Const. Co.*, 725 S.W.2d 705, 708 (Tex. 1987). The main purpose of this rule is to "reduc[e] the need for satellite litigation regarding interpretation of indemnity clauses." *Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813, 814 (Tex. 1994). Its purpose is also to guard against devious drafters of indemnity clauses whose intent is to "indemnify the indemnitee for its negligence, yet be just ambiguous enough to conceal that intent from the indemnitor." *Ethyl Corp.*, 725 S.W.2d at 707–08.

The clearest problem with CJO's argument is that Colony, as subrogee of Adsil, is seeking indemnification for costs arising from CJO's negligence, not Adsil's. (Doc. No. 57 at 1.) In this case, Adsil is the indemnitee and CJO is the indemnitor. The express negligence rule applies only to clauses that purport to indemnify the indemnitee for costs arising from its own negligence. If the indemnity clause "does not contemplate indemnifying the indemnitee from consequences of his own negligence[,] … the express negligence doctrine does not apply." *Gulf*

*Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 424 (Tex. 2000). As such, the rule that purportedly embodies a fundamental policy of Texas is seemingly not at issue in the case.

Even if the express negligence rule were at issue here, it must be the case that applying Florida law would offend the policies that the rule is meant to further. Florida law is actually quite similar to Texas law. As noted, Texas requires an indemnitee seeking coverage for its own negligence to "express that intent in specific terms." *Ethyl Corp.*, 725 S.W.2d at 708. Likewise, Florida requires the indemnitee to express that intent "in clear and unequivocal terms." *Charles Poe Masonry, Inc. v. Spring Lock Scaffolding Rental Equip. Co.*, 374 So.2d 487, 489 (Fla. 1979). Like the Texas rule, the Florida rule is concerned with ambiguous contractual language that might produce "a harsh result not necessarily contemplated by the parties." *Univ. Plaza Shopping Ctr., Inc. v. Stewart*, 272 So.2d 507, 511 (Fla. 1973).

The Fifth Circuit has previously addressed whether these two formulations differ enough for fundamental Texas policy to be at stake. *See Fina, Inc. v. ARCO*, 200 F.3d 266, 269–70 (5th Cir. 2000). Fina had purchased an oil refinery from BP and agreed to indemnify BP. *Id.* at 267–68. Fina later found environmental contamination at the site that, it believed, could be attributed to BP, so it sued for contribution and cost recovery under CERCLA. *Id.* at 268. With BP invoking the indemnity agreement, Fina called for the application of Delaware law, which required an indemnity agreement to state "clearly and unequivocally" that it included strict liability claims of the type at issue in the case. *Id.* at 269. BP argued for Texas law, citing the seemingly stricter "express negligence" rule of *Ethyl Corp. Id.* The Fifth Circuit ruled that, "[a]lthough the Texas and Delaware rules do differ, it can hardly be said that Delaware's 'clear and unequivocal' test violates a fundamental policy of Texas." *Id.* It noted that Texas did not refuse to enforce all indemnity provisions purporting to cover the indemnitee's own negligence.

"Texas merely requires that, to merit enforcement as to such claims, an indemnity provision must expressly state that its coverage extends to the negligence of the indemnitee. The 'clear and unequivocal' test is not inconsistent with a fundamental policy of Texas." *Id.* at 269–70. Consequently, to the extent the present case actually implicates the "express negligence" rule, Fifth Circuit precedent indicates that Florida law, which takes the same approach as Delaware, is not offensive to fundamental Texas policy.

That would seem to resolve the matter. CJO's theory, however, has a nuance. CJO argues that Florida law is contrary to a fundamental Texas policy not because of the small difference between these two formulations, but because of how Texas and Florida courts process claims for indemnification. CJO asserts there is a difference in cases of indemnitees sued by plaintiffs whose injuries, in actuality, were caused by conduct of indemnitors within the scope of their indemnity agreements. (Doc. No. 64 at 3.) In such cases, the indemnitee is named in the suit and has to defend itself against the claims, but the claims came about due only to the covered conduct of the indemnitor. CJO theorizes a difference in how Texas and Florida courts decide whether the costs of such litigation arise from the conduct of the indemnitee, thereby triggering the express negligence rule, or from the conduct of the indemnitor, thereby sidestepping the express negligence rule.

In CJO's understanding, Texas law instructs courts to examine only the contents of the pleading in the litigation that has imposed costs on the indemnitee. If the pleading names the indemnitee and the indemnitee wishes to be indemnified, the express negligence rule must be satisfied, no matter the actual facts giving rise to the pleading. *See Fisk Elec. Co. v. Constructors & Assocs., Inc.*, 888 S.W.2d 813 (Tex. 1994); *Gilbane Bldg. Co. v. Keystone Structural*

*Concrete, Ltd.*, 263 S.W.3d 291 (Tex. App.—Houston [1st Dist.] 2007, no pet.).[2] These cases take this approach, eschewing an inquiry into actual facts, because such an inquiry "retards rather than advances the policy of preventing satellite litigation regarding interpretation of indemnity clauses." *Fisk*, 888 S.W.2d at 815 (citing *Ethyl Corp.*, 725 S.W.2d at 708).

By contrast, Florida courts hold that it is "the indemnitee's actual wrongdoing or lack of it, rather than the allegations of wrongdoing, which determine the indemnitee's rights." *CSX Transp., Inc. v. Becker Sand & Gravel Co.*, 576 So.2d 902, 904 (Fla. App. 1991). "A plaintiff should not be able to arbitrarily deprive a defendant of his right to indemnification from a third party by alleging that he was actively negligent when in fact that defendant is found not to have been actively negligent." *Ins. Co. of N. Amer. v. King*, 340 So.2d 1175, 1176 (Fla. App. 1976) ("*King*"). Consequently, Florida courts permit an inquiry into the underlying facts, so that an indemnitee may show an indemnitor was actually to blame for its costs. *See Camp, Dresser, & McKee, Inc. v. Paul N. Howard Co.*, 853 So.2d 1072, 1080 (Fla. App. 2003); *Metro. Dade County v. Fla. Aviation Fueling Co., Inc.*, 578 So. 2d 296, 298 (Fla. App. 1991).

Despite this apparent difference, the Court is not persuaded that Texas law should govern this case rather than Florida law. Texas law is not quite as clear cut as CJO presents it. CJO's briefing makes no mention of *Gulf Insurance Company v. Burns Motors*, the Texas Supreme Court's ruling that the express negligence rule does not apply when an indemnitee is not seeking to be indemnified for the costs of its own wrongdoing. CJO leaves unreconciled the apparent

---

[2] CJO cites other cases in support of its interpretation of Texas law. *See In re West Hills Park Joint Venture*, 587 F. App'x 89 (5th Cir. 2014); *Houston Lighting & Power Co. v. Atchison, Topeka, & Santa Fe R. Co.*, 890 S.W.2d 455 (Tex. 1994); *Am. Eurocopter Corp. v. CJ Sys. Aviation Grp.*, 407 S.W.3d 274 (Tex. App.—Dallas 2013, pet. denied). Those cases are inapposite because they involve indemnitees found at least partially or concurrently liable. Texas requires an indemnity agreement that protects an indemnitee for its concurrent negligence to satisfy the express negligence rule. *Am. Eurocopter Corp.*, 407 S.W.3d at 289. But concurrent negligence is not at issue in the present case.

conflict between that ruling and those of its favored cases. CJO also makes no mention of Texas's general rule that the "facts actually established in the underlying suit control the duty to indemnify." *D.R. Horton-Texas, Ltd. v. Markel Int'l Ins. Co.*, 300 S.W.3d 740, 744 (Tex. 2009).

Moreover, CJO does not reconcile *Bell Helicopter Textron, Inc. v. Houston Helicopters, Inc.*, 2010 WL 3928741 (Tex. App.—Fort Worth Oct. 7, 2010, pet. denied). The court in that case permitted an inquiry into the facts underlying a lawsuit against an indemnitee, rather than looking only to the pleadings as CJO would have this Court do. *Id.* at *3, 5–6. CJO suggests that *Bell Helicopter* was wrongly decided. (Doc. No. 64 at 3.) In the absence of an authoritative ruling that it was, the unreconciled decision of *Bell Helicopter* and the rule of *Gulf Insurance Company* at the very least suggest a measure of uncertainty in Texas law. Such uncertainty spawns doubt that CJO's preferred cases actually embody a Texas policy implicated by the present case.

Even if *Fisk* and other cases did clearly mark out a Texas policy, it must be fundamental. Recall the Fifth Circuit's ruling that no such fundamental divergence exists between the "express negligence" rule and the "clear and unequivocal" test. *Fina*, 200 F.3d at 269. Recall also the Texas Supreme Court's general rule that the "facts actually established in the underlying suit control the duty to indemnify." *D.R. Horton-Texas*, 300 S.W.3d at 744. In view of those rulings, the Court is skeptical that fundamental interests are at stake in sub-issues concerning the proper processing of a case under the express negligence rule or similar tests. Feeling that skepticism, the Court resorts to that "most basic policy of contract law … the protection of the justified expectations of the parties." *DeSantis*, 793 S.W.2d at 677. The Court will heed the parties' contractual choice and apply Florida law.

## III.    ANALYSIS

Colony contends that CJO actually was negligent in its application of Adsil's anti-corrosion product to Calallen's HVAC units. (Doc. No. 54 at 9.) That negligence thereby implicates CJO's contractual obligation to indemnify Adsil for costs arising from CJO's negligent acts or omissions. On that basis, Colony seeks three sets of damages: "(1) the attorney's fees and litigation expenses Colony incurred defending Adsil in the Underlying Lawsuit, (2) the indemnity payments Colony made to settle AAON's claims in the Underlying Lawsuit, and (3) the attorney's fees and expenses it has incurred in prosecuting Adsil's rights under the [Mobile Installer Agreement]." (*Id.* at 3.) Colony labels these "defense costs," "settlement payments," and "prosecution costs," respectively. (Doc. No. 63 at 3.) With both parties moving for summary judgment, the question is whether any genuine issue of material fact exists as to Colony's entitlement to these costs.

### a.  Defense Costs

As noted, Florida law permits an indemnitee to recover its litigation costs if the costs arose from events or conduct that the indemnitor is obligated to cover.   *CSX Transp., Inc.*, 576 So.2d at 903; *Amer. Home Assur. Co. v. City of Opa Locka*, 368 So.2d 416, 418–19 (Fla. App. 1979); *King*, 340 So.2d at 1176–77. The indemnitee has the burden to prove that it is covered by a valid indemnity agreement; that it incurred damages within the scope of that agreement; and that the indemnitor has refused to pay. *CSX Transp., Inc.*, 576 So.2d at 903.

The contract at issue here obliges CJO to indemnify Adsil, and thus its subrogee, "against any and all claims, losses, obligations, liabilities, costs and expenses (including without limitation legal and other fees) arising from any negligent acts or omissions" of CJO. (Doc. No.

54-1 at 182–83.) The contract does not define "negligent," so the Court looks to Florida law, under which a negligence claim has four elements:

> 1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.
>
> 2. A failure on the [defendant's] part to conform to the standard required: a breach of the duty....
>
> 3. A reasonably close causal connection between the conduct and the resulting injury. This is what is commonly known as "legal cause," or "proximate cause," and which includes the notion of cause in fact.
>
> 4. Actual loss or damage.

*Clay Elec. Co-op., Inc. v. Johnson*, 873 So.2d 1182, 1185 (Fla. 2003). CJO admitted that it had a duty to properly apply Adsil's product to Calallen's HVAC units and to properly clean and prepare the equipment beforehand. (Doc. No. 54 at 9–10.) These were the duties that CJO allegedly breached, and its breach allegedly caused the corrosive damage to Calallen's equipment. (*Id.* at 10.)

Indemnity claims are often litigated together with liability for the underlying incident. *See, e.g.*, *CSX Transp., Inc.*, 576 So.2d at 903; *King*, 340 So.2d at 1176. Once liability is determined, it is easy to assign responsibility under indemnity provisions. Here, by contrast, this Court has not had the benefit of presiding over the Calallen litigation. It occurred in state court elsewhere; amassed an extensive docket, only parts of which have been relayed to this Court; and delved into complex questions of causation that are beyond this Court's understanding. Moreover, after Calallen dropped its claims against Adsil, the case settled, so there was no determination of any party's liability. (Doc. No. 59 at 7.) Thus, the Court is not in the ordinary position of knowing all the facts and liability determinations. It must rely instead on these two parties' necessarily incomplete representations.

To support its contentions, Colony provides the expert report of Gregory G. Schober, a licensed professional engineer. (Doc. No. 54-1 at 203.) Schober concludes that "damage to [Calallen's] HVAC Units arose from CJO's misapplication of the Adsil AD35 MicroGuard HVAC/R Coil Clear Protective Treatment product." (*Id.* at 204.) Schober based this conclusion on the reports of numerous other engineers[3] and on his own study of the document production in the Calallen litigation. (*Id.*) Those reports include:

- The report of William E. Harris, Jr., P.E., of HMG & Associates. Harris concluded that "[t]he coatings applied by CJO were not properly applied and this has led to the degradation of the condenser coils, which need to be replaced." (Doc. No. 54-1 at 213.)

- The report of H.W. Holder of SWK, LLC. Holder, a member of the American Society of Heating, Refrigeration and Air Conditioning Engineers (ASHRAE), was hired by Calallen. Holder concluded that the "root cause" of the damage to Calallen's equipment "was that CJO failed [to] follow the protocol set fourth [sic] by the manufacturer for repairing the coil fin-pack to accept the coating and applying the coating." (Doc. No. 54-1 at 302.) Holder also identified numerous "contributing causes," none of which implicated Adsil. (*Id.*)

- The report of Daniel J. Benac, P.E. et al. of Baker Engineering and Risk Consultants, Inc., hired by Calallen. Benac concluded: "A protective coating had been applied to the aluminum fins, but the protective coating did not appear to protect the fins. The protective coating may not have been applied or mixed properly, or the condenser may

---

[3] CJO makes a hearsay objection to the consideration of these reports. (Doc. No. 59 at 3.) CJO tries to apply the Texas Rules of Evidence, not the Federal Rules, and overlooks that experts can base their opinions on otherwise inadmissible evidence. Fed. R. Evid. 703.

not have been adequately cleaned prior to application of the protective coating." (Doc. No. 54-1 at 350.)

- The report of Nelson Forensics, LLC, hired by Colony. It concluded that "[t]o the extent that there may be deficiencies in the application of Adsil's product at the five [Calallen] schools, these deficiencies can be attributed to the product's application by CJO." (Doc. No. 54-1 at 389.) "[T]hey cannot be attributed to Adsil." (*Id.*)

Colony adds that CJO has put forward no expert testimony of its own to counter Colony's. (Doc. No. 54 at 11. ) Colony also notes that Calallen nonsuited its claims against Adsil. (*Id.* at 3.) On this basis, Colony concludes that CJO was negligent; that CJO's acts therefore came within the indemnity clause; that all of Colony's legal expenses in the underlying case arose from CJO's negligence; and thus that CJO must compensate Colony for its defense costs in the Calallen litigation.

Colony's showing suffices to create fact issues warranting denial of CJO's Motion for Summary Judgment. Whether it suffices to earn Colony summary judgment is a different question.

CJO marshals evidence in an effort to show that Adsil was itself negligent. It points to the affidavit of P.J. Sikorsky, an expert for AAON, who said: "it appears the Adsil coating was not properly applied, and this resulted in a coating with gaps or holidays." (Doc. No. 59-2 at 5.) Sikorski then speculated about the cause, suggesting that "[t]his could have resulted from a failure to follow instructions, incomplete or improper instructions from the manufacturer, errors in the manufacturing, compounding, or application process, or inherent properties of the coating." (*Id.*) This speculation implicates Adsil, but "speculative allegations … are insufficient to create a genuine issue of material fact precluding summary judgment." *Simmons v. Wilcox*,

911 F.2d 1077, 1082 (5th Cir. 1990). Moreover, in its focus on the improper application of the product, the import of Sikorsky's analysis is that blame lies with CJO.

CJO cites testimony from various depositions in the Calallen litigation tending to show that Calallen did not clean its HVAC equipment, which could have inhibited the proper application of Adsil's anti-corrosion product to the equipment. (Doc. No. 59 at 8–10.) CJO also cites the testimony of David Knebel, an engineer, that Adsil's product was clear, which would heighten the difficulty of applying it properly. (*Id.* at 10.) Finally, CJO notes that in the litigation against AAON, Adsil argued that AAON was "independently culpable" for the damage to Calallen's units because AAON's design of the units left them susceptible to corrosion. (Doc. No. 59-3 at 9.)

Each of CJO's points is meant to show that something other than CJO's negligence caused the corrosion of Calallen's equipment and led Calallen to file its lawsuit. But none of these points rebuts Colony's evidence that CJO itself was negligent. CJO's duty, the proper application of Adsil's product, may have been made more difficult by Calallen's inattention to cleaning its units or by the lack of color in Adsil's product. Numerous experts, including some not in Colony's employ, nevertheless concluded that CJO did not apply the product properly. CJO has failed to challenge the expert consensus on that point.

Doubt nevertheless remains. The doubt results from Colony's own arguments. As discussed further below, Colony also wants CJO to pay it for the settlement that Colony negotiated with AAON. AAON had claimed that Adsil manufactured a defective product, and Colony settled that claim. To demonstrate an entitlement to indemnity for the settlement payments, Colony must show that AAON's claim was at least potentially viable. To the extent

Colony shows that AAON's defective-product claim against Adsil was potentially viable, it cuts against Colony's argument that CJO's negligence was the source of the Calallen litigation.

Consequently, the Court denies summary judgment both to Colony and to CJO on Colony's claim for its defense costs in the Calallen litigation.

### b. Settlement Payments

AAON, a co-defendant in the Calallen litigation, brought claims against Adsil and CJO. (Doc. No. 54-1 at 152–70.) Its First Amended Petition recited Calallen's allegations that CJO had negligently applied the anti-corrosion product and that Adsil had given negligent instructions for its application. (*Id.* at 159.) AAON then invoked Section 82.002 of the Texas Civil Practice and Remedies Code, which provides that "[a] manufacturer shall indemnify and hold harmless a seller against loss arising out of a products liability action," other than losses stemming from the seller's own tortious conduct. AAON sought indemnification for the attorney fees that it expended in defending itself against Calallen. (Doc. No. 54-1 at 161.) Colony negotiated a settlement with AAON for $130,000, of which it paid $95,000. (Doc. No. 54 at 15.) Colony now seeks to recover that sum from CJO.

CJO responds that the indemnification provision in its contract with Adsil does not cover the claims that AAON brought against Adsil. It points to the petition in the Calallen litigation in which AAON stated its cross-claims against the two companies. (Doc. No. 59 at 10–11.) That petition theorized that Adsil's anti-corrosion product was defective because it was "translucent," making it "impossible to determine whether a consistent and uniform coating has been achieved." (Doc. No. 54-1 at 167.) This product defect was the alleged cause of the damage to Calallen's HVAC equipment, and it thereby implicated the manufacturer's duty, imposed by the

Texas Civil Practice and Remedies Code, to indemnify innocent sellers of a defective product. (*Id.*)

Because Colony settled with AAON on Adsil's behalf, it cannot assert that the course of the Calallen litigation absolved its side of blame. Instead, it must justify the settlement that it reached. Under Florida law, "when a settlement is paid, the party seeking indemnification has the burden to show that the settlement, or portions thereof, fell within the coverage of the indemnity clause." *Metro. Dade County*, 578 So. 2d at 298. The precise burden that the indemnitee must carry turns on whether the indemnitee gave the indemnitor the opportunity to handle the litigation first. If the indemnitor had the opportunity to handle the litigation, the "party seeking indemnification must establish that the settlement was made based on his *potential* liability to the plaintiff." *Camp, Dresser, & McKee, Inc.*, 853 So.2d at 1079 (emphasis in original). If, by contrast, the indemnitor was not given the opportunity, then the settling party must show that it was actually liable to the plaintiff with which it settled. *Id.* at 1080.

The record shows that CJO was given the chance to assume Adsil's defense. (Doc. No. 54-1 at 196–201.) Accordingly, Colony's burden is to show that the settlement, or a portion of it, fell within the coverage of the indemnity clause. *Metro. Dade County*, 578 So. 2d at 298. If it can make that showing, it must then establish "that the settlement or a portion thereof was attributable to … a potentially viable claim as a matter of law" and "that the portion of the settlement attributable to [that] claim was reasonable as to its amount." *Id.* at 299–300.

The evidence of CJO's negligence, discussed in the preceding section, suffices at least to deny CJO's motion for summary judgment. Colony has made a showing that CJO's negligent application of Adsil's product gave rise to Calallen's litigation and thus to AAON's cross-claim against Adsil. But the strength of that evidence works against Colony here. Colony's efforts to

show that CJO's negligence caused the Calallen litigation undermine its efforts to show that AAON had a "potentially viable claim" against Adsil. If CJO were solely to blame, it would engender doubt that AAON's claim against Adsil was potentially viable. In turn, that would suggest it was unreasonable for Colony to settle with AAON.

Colony nevertheless settled that claim. It may have had valid reasons for doing so absent any fault on the part of Adsil, but it has not adequately presented those reasons. Consequently, fact issues persist that preclude granting summary judgment to Colony on its claim for the settlement payment to AAON.

## IV. CONCLUSION

In order to recover on all of its claims, Plaintiff Colony Insurance Company must make a case that jointly accounts for CJO's negligence and for the potential viability of AAON's product-liability claim against Adsil. It may yet manage to do so. It has furnished enough evidence in its favor to warrant denial of CJO's motion for summary judgment. It has not, however, furnished enough to warrant a grant of its own. Accordingly, Defendant CJO Enterprises' Motion for Summary Judgment (Doc. No. 53) is **DENIED**. Plaintiff Colony Insurance Company's Motion for Summary Judgment (Doc. No. 54) is likewise **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on the 4th day of June, 2018.

_____
HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE